**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

IN THE UNITED STATES DISTRICT COURT

FEB 2 4 2011

FOR THE DISTRICT OF NEW MEXICO

MATTHEW J. DYKMAN
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 11-CR-404 |
| | ) | |
| vs. | ) | Counts 1-3: 18 U.S.C. §§ 1343 and 2; |
| | ) | Wire Fraud; |
| **DOUGLAS F. VAUGHAN,** | ) | |
| | ) | Counts 4-20: 18 U.S.C. §§ 1341 and 2; |
| Defendant. | ) | Mail Fraud; |
| | ) | |
| | ) | Counts 21-25: 18 U.S.C. §§ 1957 and |
| | ) | 2; Laundering of Monetary |
| | ) | Instruments; |
| | ) | |
| | ) | Count 26-30: 18 U.S.C. § 1001; False |
| | ) | Writings and Documents. |

## INDICTMENT

The Grand Jury charges:

1. As used in this Indictment, the term "Ponzi scheme" is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often entice new investors by promising to invest funds in ostensibly legitimate opportunities claimed to generate high or even above-market returns with little or no risk. When new investor funds are diverted to repay existing investors, the existing investors are lulled into believing that they in fact are receiving the returns on their investments that they had been promised. In many Ponzi schemes, the fraudsters focus on attracting new money to make promised payments to earlier-stage investors and to use for personal expenses, instead of engaging in much if any legitimate investment activity.

The Ponzi Scheme and Artifice to Defraud

Vaughan Company, Realtors

2.  The Vaughan Company, Realtors (hereinafter "VCR") was incorporated under the laws of the State of New Mexico on November 13, 1972 by the defendant, **DOUGLAS F. VAUGHAN** (hereinafter **VAUGHAN**).  At all times relevant to this Indictment, **VAUGHAN** was the chairman, chief executive officer, president, and majority owner of VCR, as well as the sole member of its board of directors.  VCR primarily operated as a residential real estate brokerage.  With up to six offices and over 150 agents, VCR was at one time the largest independent residential brokerage in New Mexico.

3.  In or about April 1993, claiming to have grown disenchanted with the difficulty of borrowing money from banks, **VAUGHAN** began an investment program in which he accepted money from investors in exchange for interest-bearing promissory notes.  VCR's promissory note investment program (hereinafter "promissory note program") began with approximately nine investors investing an approximate total of $200,000.00.

4.  Over the life of the promissory note program, the promissory notes followed a fairly predictable pattern.  The term of the notes varied but was typically three years and the interest rate ranged from as low as approximately 8% to as high as 40% per year.  The notes typically provided that interest was to be paid in monthly installments.  At the end of the term of a note, **VAUGHAN** either paid off the principal of the note or offered the investors the opportunity to "roll over" the principal into a new note typically at the same or higher interest rate. **VAUGHAN** signed each promissory note on behalf of VCR.

5.  The promissory notes contained the following language purporting to limit the size of

2

the promissory note program: "This Note is one of an issue of Promissory Notes in the aggregate principal amount not to exceed [a sum certain of money] and issued in various denominations, interest rates, and maturities."  Between 1993 and 2010, the sum certain identified in the promissory notes increased gradually but never exceeded $2,500,000.00.  Another provision of the promissory note reiterated that "[t]his Note is part of an issue the aggregate amount of which shall not exceed [the sum certain identified in the earlier paragraph]."

6.  The promissory notes also provided that "[t]his Note and all Notes of this issue are secured by a Deed of Trust to [Name of Trustee]."  At various times between 1993 and 2010, **VAUGHAN** pledged to this trust certain bank accounts, stock holdings, and pieces of real property that he owned in his personal capacity.

7.  In addition to VCR's corporate promise to repay investors and the properties pledged to the Deed of Trust, the promissory notes also purportedly were collateralized by a "Personal Guarantee" signed by **VAUGHAN**.  This guarantee signified that **VAUGHAN** was promising, in his personal capacity, to pay the promissory notes.

8.  In his marketing materials, written correspondence, and in discussions with current and prospective investors, **VAUGHAN** led many investors to believe that their investments were either actually or virtually risk-free.  **VAUGHAN** conveyed to these investors that the combined protection provided by VCR's corporate guarantee, his personal guarantee, and the property pledged to the Deed of Trust was more than enough to secure their investments.

9.  Between 1993 and 2010, **VAUGHAN** marketed the promissory note program in multiple ways.  For example, he paid referral fees to individuals engaged in selling securities and providing investment advice.  He caused the promissory note program to be made available to various trust companies, including Zia Trust and Sunwest Trust in Albuquerque, as well as

Sterling Trust in Waco, Texas.  These trust companies then made VCR an investment option for

their clients.  **VAUGHAN** also relied on word-of-mouth advertising from existing investors, who

would recruit family members, friends, and associates to invest in the program.

10.  **VAUGHAN** distributed to proposed investors an "Executive Summary" explaining

the promissory note program and how the invested funds would be used.  The language in the

Executive Summary varied little over the years and **VAUGHAN** continued to distribute them

until or near the collapse of the promissory note program.  As an example, the 2005 version of

the Executive Summary included this excerpt:

> What are we using the funds for today?  There are two main reasons:
>
> 1) We are the only real estate company in Albuquerque that I know
> of that has a successful, written guaranteed sale plan.  This is a
> program where we take our client's home in trade when they buy
> another home from us.  A typical transaction would be someone
> who owns a $150,000 house who wants to buy a $300,000 house,
> but doesn't know how to overcome the age old dilemma -- Do I sell
> my current home first and then buy, or do I buy the bigger house
> first and then try to sell my home?  If they do the former, they will
> have an intermediate expensive move, as the buyer of their old
> home will not wait while they look for the new home. And, if they
> choose the latter course of action, they're stuck with double house
> payments, even if they can qualify for the bigger house, until they
> sell their older house.  This is a great marketing tool that has
> enabled our firm to make a lot of transactions and, also, attract a lot
> of listings.  The average loan that we advance on a trade-in is
> approximately $40,000.  We are, however, very well protected, as
> we only advance to a maximum of 75% of an appraisal less the
> current existing mortgage.  Whenever a homeowner participates in
> this program, we charge them an extra 1% commission which we
> do not split with our agent. In addition to that, we charge the
> homeowner 10-12% on the money we advance them for the period
> of time that it is outstanding.  Our average length of time has been
> between 90-120 days.  Our return (20-25%) is significant when you
> take into consideration the relatively short period of time we have
> the funds advanced.
>
> 2) The second program we are using the money for is to acquire
> smaller real estate companies.  In Albuquerque, there are 500 real

> estate companies, two of which make up 50% of the market. We
> are one of the two. We have purchased, in our history, about ten
> real estate companies. It's a faster way for us to capture more
> market share, and, quite frankly, is a cheaper way to grow than via
> the internal hiring of new people and training them.

In October 2009, after receiving a subpoena for information from the Securities and Exchange Commission, **VAUGHAN** amended his Executive Summary to add a third use of the promissory note investors' money: "About once a year I will find a real 'steal' that I can invest in and make a significant profit if I am able to move quickly enough. I've been able to do this on the average of once per year and have realized significant profits."

11. In contrast to the representations in the Executive Summary, **VAUGHAN** used the proceeds from the promissory note program primarily for three undisclosed purposes: (a) to pay the interest and principal on promissory notes taken out by earlier investors; (b) to pay himself, either under the guise of salary, bonuses, or other personal transfers; and (c) to subsidize the corporate operations of VCR, which was generating insufficient "legitimate" real estate-related revenue to sustain itself.

12. In addition to distributing the Executive Summaries, **VAUGHAN** also caused promissory noteholders to receive newsletters along with their monthly interest checks. These newsletters often were accompanied by positive news articles regarding the real estate market in Albuquerque. For example, the July 2009 newsletter included this excerpt in a "six month report card" for **VAUGHAN's** companies:

> From a micro analysis, the report card for the Vaughan Companies
> is quite good. . . .
>
> The Vaughan Company Realtors (our residential real estate
> company founded in 1973) saw its May pending sales jump 17%
> over May 2008. June pending sales were up 18% over June of
> 2008. Also, June 2009 was The Vaughan Company Realtors best
> month in pending sales since October 2006!

The letter closed with "Best wishes. Looking forward to a healthy and prosperous of [sic] 2009."

13. In a newsletter sent to investors in February 2009, **VAUGHAN** wrote that "[s]ome of you wonder why I continue to send out positive updates. Well, quite simply, someone has to balance the constant negativity in the media."

14. The August 2009 newsletter touted the "housing market recovery." The September 2009 and October 2009 newsletters exclaimed, respectively, "great news!" and "even more great news!" All three newsletters were accompanied by news articles providing positive information regarding the real estate business. In none of these newsletters, nor in any of their predecessors, did **VAUGHAN** ever mention the recurring and growing financial losses that VCR had been sustaining every year for several years. Similarly, neither **VAUGHAN** nor his newsletters ever mentioned that the noteholders would cease to be repaid unless **VAUGHAN** continued to find new promissory note investors.

15. **VAUGHAN** administered the promissory note program largely by himself, with assistance from his accounting manager and other clerical personnel. In addition, **VAUGHAN** endeavored to keep the program confidential by shielding its size, scope, and details from the management team of **VAUGHAN's** closely-associated business entities. **VAUGHAN** kept amortization schedules for the promissory note program on a separate spreadsheet, access to which was restricted primarily to **VAUGHAN** and his accounting manager. **VAUGHAN** personally decided which investors got paid and when they were paid.

16. **VAUGHAN** used the VCR operating account to manage the flow of money into and out of the promissory note program. All investments were deposited into the operating account, where they were commingled with real estate commissions and other sources of VCR revenue. Similarly, **VAUGHAN** caused all interest and principal payments on the promissory notes to be

made from that account. The payments typically took the form of checks bearing **VAUGHAN's** signature stamp that thereafter were mailed to the investors.

17. By at least as early as 2005, the promissory note program had become the primary source of revenue for VCR. Indeed, without the infusion of capital provided by new promissory note investors, VCR was insolvent. In other words, VCR was not earning enough revenue from its legitimate real estate-related entities to pay its operating expenses and its debts. Nonetheless, **VAUGHAN** continued to distribute substantially the same marketing materials, sign the same promissory notes, and make the same corporate and personal guarantees.

18. **VAUGHAN** ultimately modified the Deed of Trust to raise the total investment limit under the promissory note program to $2,500,000.00. Although **VAUGHAN** represented to investors that he would not extend more than $2,500,000.00 in promissory notes, he full well knew that the aggregate principal balance owed to the noteholders in the promissory note program (as reflected either in VCR's internal accounting records or VCR's corporate tax returns) substantially exceeded that amount. Indeed, at the end of each year between 2004-2009, the approximate aggregate principal balance owed to the noteholders was $24,351,605.00 (2004), $32,229,363.37 (2005), $39,969,110.68 (2006), $49,984,845.80 (2007), $62,844,445.57 (2008), and $74,386,623.38 (2009).

19. From at least as early as 2005 through in or about February 2010, **VAUGHAN** used proceeds from new investors to make Ponzi-style interest payments to existing noteholders. In so doing, **VAUGHAN** lulled the existing investors into believing that they were being paid returns from VCR's legitimate business revenue rather than simply from the infusion of funds from new promissory note investors.

20. By fraudulently misrepresenting the safety of the promissory notes and the security of

the purported collateral, **VAUGHAN** continued to attract new investment capital.  **VAUGHAN** did so even though he full well knew that VCR was steadily losing money.  Indeed, VCR's corporate tax returns, signed by **VAUGHAN**, reflected annual net losses between 2004-2008 of $4,041,048 (2004), $5,595,285 (2005); $7,461,409 (2006), $9,913,893 (2007), and $13,313,323 (2008).  The corporate tax return filed on behalf of VCR for tax year 2009 reflected a loss for that year of $13,907,738.  Consequently, just for tax years 2004-2009, VCR showed a cumulative net operating loss of more than $54,000,000.00.

21.  Between in or about 2005 and in or about February 2010, **VAUGHAN** did not inform, either directly or indirectly, any investors making initial investments or rolling over earlier investments that:

a.  Their investments would be used to pay the interest and principal to existing noteholders.

b.  Without the infusion of capital provided by new investor deposits, VCR was insolvent and was not able to pay its obligations, including investor interest expense and principal repayment;

c.  VCR had been losing money and carrying over losses every year since at least 1994, with a cumulative net operating loss at the end of 2009 of more than $68,000,000.00.  Moreover, the cumulative net operating loss just for tax years 2004 through 2009 was more than $54,000,000.00.

d.  In contrast to the Deed of Trust's explicit limitation that the aggregate principal owed to investors in the promissory note program would not exceed $2,500,000.00, the aggregate principal owed at the end of each year between 2004-2009 was $24,351,605.00 (2004), $32,229,363.37 (2005), $39,969,110.68 (2006), $49,984,845.80 (2007), $62,844,445.57 (2008),

and $74,386,623.38 (2009).

e. **VAUGHAN** was using investor proceeds for personal expenses, including but not limited to the construction and furnishing of a mansion overlooking the Tanoan golf course, the purchase of a Ferrari, the purchase of an ownership interest in a developmental professional basketball league, and the payment of costs associated with frequent travel to and entertainment in Las Vegas, Nevada.

f. **VAUGHAN** had been transferring himself money from the VCR operating account. These transfers were referred to on VCR's corporate tax returns as "loans to shareholder." According to the corporate tax returns, the balance of these transfers at the end of 2003-2008 was $391,658 (2003); $1,621,795 (2004); $3,207,137 (2005); $4,279,503 (2006); $5,027,668 (2007); and $5,175,966 (2008). As of the end of December 2009, according to VCR's internal accounting records, the balance on the transfers was $5,372,718.34.

22. Had **VAUGHAN** provided the information in the preceding paragraph to promissory note investors who either invested new money or rolled over previous investments between in or about 2005 through in or about February 2010, the investors would not have invested in new notes and/or would not have rolled-over their existing notes.

23. On or about August 6, 2009, for the purpose of making interest payments to VCR noteholders, **VAUGHAN** caused to be transferred to the VCR operating account a total of $300,000.00 from an account associated with a separate investment entity named "Vaughan Equities III." As explained in its Confidential Private Placement Memorandum, the purpose of Vaughan Equities III was to acquire a tract of land in or near Bernalillo, New Mexico, on which to develop a shopping center. The Memorandum added:

> Pending the utilization of the proceeds from this offering, the
> proceeds will be invested by the Manager [**VAUGHAN**] in

certificates of deposit, repurchase agreements, and other banking and government securities. The Company will only utilize or invest in depository or trust institutions which satisfy capital standards of bank regulatory authorities.

VAUGHAN's transfer of money from the Vaughan Equities III account to VCR to temporarily forestall the collapse of the fraudulent promissory note program was in direct contradiction to the Memorandum's limitations on the uses to which the proceeds could be put.

24. Beginning in or about September 2009, as his Ponzi scheme began to collapse, VAUGHAN became unable to meet his monthly interest payments to the promissory note investors. Consequently, VAUGHAN personally decided which investors would get paid and when the payments were mailed to them. Numerous VCR investors attempted to contact VAUGHAN, either directly or through his accounting manager or other employees, to determine why their monthly interest checks had begun arriving late or not at all. Either personally or through others, VAUGHAN provided a series of false or misleading excuses to the investors, including blaming inexperienced employees for allegedly placing interest checks backwards in window mailing envelopes. At no time did VAUGHAN relate to these investors, either directly or indirectly, that their interest checks were late or not sent at all because VCR had insufficient revenue to pay them.

25. On or about February 22, 2010, VAUGHAN filed for personal and corporate bankruptcy protection. At that time, the aggregate principal balance that he and VCR owed to approximately 600 noteholders was approximately $74,745,723.93. The interest expense owed to the investors exceeded $1 million per month. In regard to the personal guarantee that VAUGHAN had signed and attached to each of the promissory notes, VAUGHAN asserted a negative net worth when he filed for bankruptcy.

Vaughan Capital, LLC

26. In addition to VCR's promissory note program, **VAUGHAN** formed another alleged investment program that also was part of the Ponzi scheme and artifice to defraud. On or about June 20, 2008, **VAUGHAN** formed Vaughan Capital, LLC (hereinafter "VC"). The sole "Initial Member of the Company" was Phoenician Financial Services, LLC, which itself was wholly owned by **VAUGHAN**. As set forth below, **VAUGHAN** used VC as a means to attract new funds that he used to perpetrate and perpetuate his fraudulent promissory note Ponzi scheme.

27. **VAUGHAN** caused to be prepared a Confidential Private Placement Memorandum ("Memorandum") for prospective VC investors. The Memorandum described **VAUGHAN** as the "Manager" of the Company and further stated that VC would be limited to a maximum of 24 investors and that its aggregate offering price was $10,000,000.00.

28. The Memorandum set forth a "business concept" for VC that began "[i]n the context of today's financial markets, a business opportunity has been identified for equity capital. The Company is being formed for the purpose of raising capital and investing in these opportunities." The business concept then went on to identify five investment "opportunities" that are described in pertinent part as follows:

> 1. *Investment in Distressed Properties.* Current financial markets, economic considerations, and real estate markets, have resulted in many properties that can be acquired at favorable prices. . . . The Company will identify these properties primarily in New Mexico, Arizona, and Nevada. Properties acquired would be rented, renovated if necessary, held for investment or resold at the earliest time that required rates of return are achieved.
>
> 2. *Loan Portfolios.* Existing lenders are selling loan portfolios of residential properties at significant discounts. The Company will attempt to locate loan portfolios which can be purchased at a discount, evaluate the collateral and the risks, and acquire those loan portfolios at prices which will achieve the sought after return.

11

3. *Loans*. The Company will identify and make loans to qualified borrowers with adequate collateral. These loans will generally be high interest rate loans which are classified as bridge loans or mezzanine financing.

4. *Bridge Loans*. The Company will offer loans to bridge the funding gaps before closing of permanent financing. These transitional loans are short-term in duration (generally less than one [1] year), and are generally associated with high fees for going past the due date to provide an incentive to the borrower to pay off the loan on or before the maturity date.

5. *Mezzanine Financing*. Mezzanine financing is generally put in place when a developer or property owner determines that short or medium term lending is less costly than raising additional capital or providing equity. These loans are typically high-yielding loans, subordinate to senior mortgage loans and collateralized by real estate properties. Mezzanine loans will typically have a longer duration than transitional or bridge loans.

29. In addition to the Memorandum, **VAUGHAN** also caused to be prepared an "Operating Agreement" that included a "Business Plan," which provided that the:

Company will engage in three (3) avenues of business or acquisition. (1) The Company will make hard money loans which will include bridge loans and/or provide mezzanine financing to commercial customers that are qualified for the loans, and in most cases collateralized by second mortgages on real property; (2) the Company will acquire real properties, primarily residential, but including some commercial real estate, through discounted purchases, acquisition through foreclosure, or otherwise, so as to acquire properties at prices significantly lower than projected values; and (3) the Company will attempt to buy portfolios of residential loans at deeply discounted prices based on current market conditions.

30. In a cover letter that accompanied the Memorandum and the Operating Agreement, **VAUGHAN** emphasized the opportunities in which VC would invest its capital:

There will be three revenue streams for investors:

1. We will purchase distressed real estate at 50¢ on the dollar or less. . . .

2. We will buy discounted first mortgages for less than 50¢ on the dollar. . . .

> 3.  We will be a hard money lender primarily to investors/developers earning 22% plus on our money for short term loans (3 months to 36 months). . . .

31.  On October 30, 2009, **VAUGHAN** met with an individual he believed to be a prospective VC investor in **VAUGHAN**'s office in Albuquerque, New Mexico.  **VAUGHAN** explained that the individual had to be an "accredited investor" in order to participate in the VC offering.  **VAUGHAN** further explained that accredited investor status required compliance with certain criteria related to net worth or annual income.  Specifically, as related by **VAUGHAN**, an individual investor had to have either a net worth in excess of $1,000,000.00 or an annual income of more than $200,000.00 in each of the past two years.  When the putative prospective investor admitted that he did not meet either criterion, **VAUGHAN** instructed him to falsely represent on the investment's Confidential Private Placement Memorandum that he did meet the accredited investor criteria.  When the individual agreed to make a $250,000.00 investment via wire transfer, **VAUGHAN** provided him with wiring instructions.

32.  Between on or about December 5, 2008 and on or about January 8, 2010, a total of approximately 24 investors (not including **VAUGHAN**) invested a total of approximately $6,187,501.57 into VC.  To that amount was added approximately $781,038.91 in what were recorded in the VC account as "miscellaneous deposits," resulting in a total capitalization for VC of $6,968,540.48.

33.  An analysis of the VC account showed the following expenditures between December 5, 2008, and February 26, 2010:

> a.  $314,884.55 was returned to investors as distributions;
>
> b.  $316,727.77 was used to buy two single-family dwellings in Las Vegas, NV;
>
> c.  $16,575.48 was used to pay miscellaneous expenses, including to Desert Realty Inc. for costs associated with the two Las Vegas home purchases;

   d.  $82,611.33 was transferred to Vaughan himself; and

   e.  $6,232,092.74 was transferred to VCR's operating account, a substantial
   portion of which was used to pay VCR promissory note investors.

34.  **VAUGHAN** directed the transfers from VC to VCR, which began almost
immediately after the first person other than **VAUGHAN** invested in VC.  In his role as
chairman of VCR, **VAUGHAN** signed promissory notes with typically three-year terms and
interest rates between 14-17.5%.  In addition, the notes promised that VCR would pay VC an
origination fee ranging from 6-7.5%.  Then, in his role as the Manager of VC, **VAUGHAN**
agreed to these terms.  In sum and substance, therefore, **VAUGHAN** was dealing only with
himself in authorizing and accepting these transfers from VC to VCR.

35.  The VCR promissory note program was not one of the listed investment
opportunities in the VC marketing literature, nor did **VAUGHAN** mention it in any discussions
he had with prospective or existing VC investors.  At no time did **VAUGHAN** communicate to
prospective or existing VC investors that he had diverted, was diverting, and intended to continue
diverting VC's capital to the VCR operating account for use in paying VCR's operating
expenses, dominated by interest expense owed to promissory noteholders.

36.  **VAUGHAN** directed that money be transferred from VC to VCR on approximately
65 occasions.  With the exception of two transfers of less than $100, the amounts transferred
ranged from $14,000.00 to $250,000.00.

37.  At various times from in or about May 2009 through December 2009, **VAUGHAN**
directed that a total of $314,884.55 be distributed to VC investors.  **VAUGHAN** caused these
payments to be made for the purpose of lulling the existing VC investors into believing that their
investments had been invested as promised in distressed real estate, discounted mortgages, or
hard money loans (bridge loans or mezzanine financing) and were earning the return on those

investments.

38.  After **VAUGHAN** filed for personal and corporate bankruptcy, the almost $7 million
of initial capital in VC had shrunk to two residential properties in Las Vegas, Nevada, with an
approximate total value of less than $350,000.00, and the remaining balance in VC's bank
account of $5,648.61.

39.  Had **VAUGHAN** disclosed to VC's investors that he intended to use, and in fact did
use, the vast majority of VC's capital to repay VCR's promissory noteholders, thereby
temporarily forestalling the collapse of the promissory note program, the investors would not
have invested in VC.

Specific Investors

Investor A

40.  It was an example of and a further part of the scheme and artifice that:

a.  On or about January 5, 2008, **VAUGHAN** told Investor A in an interstate
telephone conversation that VCR was a successful company in which Investor A should invest.

b.  On or about February 7, 2008, **VAUGHAN** caused Investor A to invest
$100,000.00 in the VCR promissory note program via interstate wire transfer from Investor A's
Smith Barney Financial Management account to the VCR operating account.

c.  On or about February 7, 2008, **VAUGHAN** e-mailed in interstate commerce to
Investor A a promissory note documenting the $100,000.00 investment in VCR at 13% interest
for three years.

d.  On or about June 25, 2009, **VAUGHAN** caused a VC Confidential Private
Placement Memorandum to be mailed to Investor A's residence in Colorado.

e.  On or about August 26, 2009, **VAUGHAN** caused Investor A to invest

15

$120,989.57 in VC via interstate wire transfer from Investor A's Smith Barney Financial Management account to the VC account.

      f. In or about October 2009, **VAUGHAN** falsely assured Investor A during an interstate telephone conversation that VC was a separate company from VCR and intimated that no VC investor money was or would be transferred to VCR.

      g. In or about February 2010, **VAUGHAN** told Investor A during an interstate telephone conversation that he (**VAUGHAN**) had invested $6,000,000.00 of VC investor money in VCR because he believed it was the best place to invest the money.

      h. From on or about February 13, 2008 to on or about November 6, 2009, **VAUGHAN** caused monthly VCR lulling interest payments to be mailed to Investor A's residence in Colorado.

Investor B

    41. It was an example of and a further part of the scheme and artifice that:

      a. On or about October 10, 2007, **VAUGHAN** caused a personal letter to be mailed to Investor B's residence in Oregon. In the letter, **VAUGHAN** stated he would use some of the VCR promissory note investment money to purchase small real estate companies.

      b. On or about October 12, 2007, **VAUGHAN** caused Investor B to invest $300,000.00 in the VCR promissory note program via a wire transfer from Investor B's Bank of America account to the VCR operating account.

      c. On or about October 12, 2007, **VAUGHAN** caused a promissory note documenting the $300,000.00 investment at 20% interest for three years to be sent via facsimile to Investor B's residence in Oregon.

      d. On or about January 17, 2008, **VAUGHAN** caused a Deed of Trust purporting

16

to secure the collateral for the promissory note to be mailed to Investor B's residence in Oregon.

e. From on or about October 16, 2007 to on or about September 9, 2009, **VAUGHAN** caused lulling interest payments to be mailed to Investor B's residence in Oregon.

<u>Investor C</u>

42. It was an example of and a further part of the scheme and artifice that:

a. On or about August 20, 2009, **VAUGHAN** caused an income statement for VC to be mailed to Investor C's post office box in New Mexico.

b. On or about January 6, 2010, **VAUGHAN** caused Investor C to mail a personal check for $125,000.00 and a signed VC subscription agreement to invest in VC to **VAUGHAN's** office in Albuquerque, New Mexico.

c. On or about January 6, 2010, **VAUGHAN** caused a signed copy of the VC subscription agreement to be mailed to Investor C's post office box in New Mexico.

<u>Investor D</u>

43. It was an example of and a further part of the scheme and artifice that:

a. In or about September, 2006, **VAUGHAN** met in his office with Investor D. **VAUGHAN** told Investor D he used investor money to make bridge loans and to purchase both commercial and residential real estate. **VAUGHAN** told Investor D he could afford to pay Investor D 13% interest because **VAUGHAN** was averaging 22% return on VCR investor money. **VAUGHAN** falsely told Investor D the property in the Deed of Trust was appraised every six months in order to ensure it contained sufficient value to cover the promissory note program's outstanding debt. **VAUGHAN** also falsely told Investor D that, as the amount borrowed increased, he would add additional property to the Deed of Trust to maintain the appropriate level of collateral.

b.  On or about September 25, 2006, **VAUGHAN** caused Investor D to transfer $200,000.00 from his IRA to VCR at 13% interest for three years.

c.  From on or about September 25, 2006 to on or about September 21, 2009, **VAUGHAN** caused Investor D and Investor D's spouse to invest an additional $310,000.00 in the VCR promissory note program in exchange for multiple promissory notes.

d.  On or about September 30, 2009, **VAUGHAN** convinced Investor D to roll over the $200,000.00 VCR promissory note for another three years at the increased rate of 16%.

e.  From on or about October 6, 2006 to on or about January 7, 2010, **VAUGHAN** caused lulling interest payments to be mailed to Investor D's residences in other states.

Investor E

44.  It was an example of and a further part of the scheme and artifice that:

a.  On or about September 16, 2009, **VAUGHAN** met in his office with Investor E.  **VAUGHAN** asked Investor E to invest in VCR, but Investor E declined.  **VAUGHAN** then asked Investor E to invest in VC.  **VAUGHAN** provided Investor E with three VC profit and loss statements and falsely stated that VC was "doing quite well."  **VAUGHAN** also provided a list of references and a Confidential Private Placement Memorandum for VC.  **VAUGHAN** told Investor E that a former professional baseball player invested $1,000,000.00 in VC.

b.  On or about December 30, 2009, **VAUGHAN** paid Investor E $20,000.00 and accepted a plot of land located in Albuquerque that Investor E owned in exchange for $200,000.00 worth of VC Membership Units.

c.  On or about January 5, 2010, **VAUGHAN** caused a VC Confidential Private Placement Memorandum to be mailed to Investor E's residence in New Mexico.

Investor F

45. It was an example of and a further part of the scheme and artifice that:

a. In or about September 2006, during a telephone conversation, **VAUGHAN** falsely told Investor F that the VCR promissory note program had approximately $1,500,000.00 to $2,000,000.00 invested and that the VCR Board of Directors (which **VAUGHAN** full well knew consisted solely of himself) might be willing to expand.

b. On or about September 19, 2006, **VAUGHAN** caused Investor F to mail a personal check for $500,000.00 to VCR.  **VAUGHAN** then caused a promissory note documenting a $500,000.00 investment for three years at 17% to be mailed using a private carrier to Investor F's residence in Washington.

c. On or about September 30, 2009, **VAUGHAN** caused a new promissory note documenting the rolling over of Investor F's original $500,000.00 investment to be mailed to Investor F's residence in Washington.  Investor F called **VAUGHAN** and informed him that Investor F instead wished to withdraw the $500,000.00 principal as the original promissory note had matured.  **VAUGHAN** informed Investor F that he did not have the money to repay the principal.  **VAUGHAN** told Investor F he would have to "sell something" in order to pay Investor F his $500,000.00.  **VAUGHAN** asked Investor F to roll over the note under an agreement that Investor F could withdraw $100,000.00 in 90 days.  **VAUGHAN** falsely assured Investor F that his investment was safe.

d. From on or about October 7, 2006 to on or about December 10, 2009, **VAUGHAN** caused lulling interest payments to be direct deposited into Investor F's Bank of America account.

e. On or about February 12, 2010, in a telephone conversation, Investor F

informed **VAUGHAN** that he wished to withdraw the $100,000.00 that they agreed to when

Investor F rolled over the $500,000.00 promissory note. **VAUGHAN** again told Investor F he

did not have the money. **VAUGHAN** falsely told Investor F that VCR was not having financial

troubles and Investor F's investment was safe. Investor F demanded the $100,000.00 by May

2010. **VAUGHAN** told Investor F that "I will just go out and get another investor" to get

Investor F his money.

Investor G

46. It was an example of and a further part of the scheme and artifice that:

a. On or about January 20, 2009, **VAUGHAN** met with Investor G. **VAUGHAN**

explained VC to Investor G and asked him to invest. **VAUGHAN** caused Investor G to invest

$375,000.00 via a personal check that Investor G handed to **VAUGHAN**, who in turn provided

Investor G with a VC Confidential Private Placement Memorandum.

b. In the summer of 2009, **VAUGHAN** provided Investor G with a VC financial

statement. Investor G asked him why VC had only purchased two properties in Las Vegas.

**VAUGHAN** falsely told Investor G that VC had $6,000,000.00 to $7,000,000.00 to invest but he

had yet to find the "right" investment opportunity.

c. On or about May 15, 2009 and on or about August 27, 2009, **VAUGHAN**

caused two separate VC lulling payments to be mailed to Investor G's post office box.

Investor H

47. It was an example of and a further part of the scheme and artifice that:

a. On or about November 16, 2005, **VAUGHAN** called Investor H and asked him

to invest in VCR. He told Investor H he could afford to pay investors high interest rates because

the investors brought his real estate company a great deal of residual business.

20

b. On or about November 16, 2005, **VAUGHAN** caused a letter explaining the VCR promissory note program and a list of VCR investor references to be mailed to Investor H's residence in Texas.

c. In or about November 23, 2005, **VAUGHAN** caused Investor H to mail a personal check to VCR for $225,000.00 to invest in the VCR promissory note program.

d. On or about November 28, 2005, **VAUGHAN** caused a promissory note documenting the $225,000.00 investment for three years at 14% to be mailed to Investor H's residence in Texas.

e. On or about March 25, 2008, in a telephone conversation, **VAUGHAN** told Investor H that, if Investor H invested more money, **VAUGHAN** would increase Investor H's interest rate on all investments to 14.5%.

f. On or about March 25, 2008, **VAUGHAN** caused Investor H to mail a personal check for $175,000.00 to invest in the VCR promissory note program.

g. On or about November 30, 2008, **VAUGHAN** caused a promissory note documenting the roll over of Investor H's original $225,000.00 investment to be mailed to Investor H's residence in Texas.  The term of the new note was for three years at 14.5% interest.

h. From on or about December 7, 2005 to on or about November 9, 2009, **VAUGHAN** caused lulling payments to be direct deposited into Investor H's bank account.

Investor I

48. It was an example of and a further part of the scheme and artifice that:

a. On or about December 7, 2007, **VAUGHAN** received a check from Investor I for $300,000.00 to invest in the VCR promissory note program.  **VAUGHAN** gave Investor I three promissory notes documenting three separate investments for $100,000.00 for one, two and

three years at 16% interest.

  b. On or about July 10, 2008, **VAUGHAN** received three additional checks from Investor I totaling $160,000.00 to invest in the VCR promissory note program. **VAUGHAN** provided Investor I with one promissory note documenting a $100,000.00 investment for one year at 16% interest and one promissory note documenting a $60,000.00 investment for two years at 16% interest.

  c. On or about November 18, 2009, **VAUGHAN** received two cashier's checks totaling $150,000.00 from Investor I. **VAUGHAN** provided Investor I with a promissory note documenting a $150,000.00 investment for three years at 17% interest.

  d. In 2009, **VAUGHAN** had a conversation with Investor I in which Investor I expressed concern that the language of the promissory notes stated that the total investment would not exceed $2,000.000.00. **VAUGHAN** falsely told Investor I there were multiple cap deals with different investors in each deal and that each capped deal was exclusive of others.

  e. From on or about December 12, 2007 to on or about December 14, 2009, **VAUGHAN** caused lulling interest payments to be mailed to Investor I's residence.

<u>Investor J</u>

  49. It was an example of and a further part of the scheme and artifice that:

  a. In or about December 2008, **VAUGHAN** met in his office with Investor J and Investor J's spouse. Investor J expressed concern about potentially investing in VCR due to the news coverage of the Bernard Madoff "Ponzi scheme" case. **VAUGHAN** falsely assured Investor J that no investor money was used to pay the interest or principal for other investors.

  b. On or about January 2, 2009, **VAUGHAN** caused Investor J to invest $250,000.00 in the VCR promissory note program. Investor J hand-delivered a cashier's check

to **VAUGHAN**.  **VAUGHAN** provided Investor J with a promissory note documenting a

$250,000.00 investment for one year at 12% interest.

   c.  On or about January 21, 2010, **VAUGHAN** met in his office with Investor J

and Investor J's spouse.  He asked them to renew their promissory note for three months because

he did not have the $250,000.00 he owed to them.  Investor J agreed after **VAUGHAN** stated he

could pay the $250,000.00 by April 22, 2010. **VAUGHAN** provided Investor J with a promissory

note documenting the rolling over of the $250,000.00 investment until April 22, 2010 at 12%.

   d.  From on or about January 9, 2009 to on or about December 14, 2009,

**VAUGHAN** caused lulling interest payments to be mailed to Investor J's office in New Mexico.

Investor K

  50.  It was an example of and a further part of the scheme and artifice that:

   a.  On or about October 31, 2007, **VAUGHAN** caused a roll over promissory note

of Investor K's $60,000.00 VCR investment to be mailed to Investor K's post office box in New

Mexico.  The roll over note was for a term of three years at 14% interest.

   b.  On or about November 20, 2007, **VAUGHAN** caused Investor K to transfer

$100,000.00 from his IRA with Zia Trust to the VCR promissory note program.

   c.  On or about November 20, 2007, **VAUGHAN** caused a VCR promissory note

documenting the $100,000.00 investment for three years at 15% interest to be mailed to Investor

K's post office box in New Mexico.

   d.  From on or about May 6, 2005 to on or about November 9, 2009, **VAUGHAN**

caused lulling interest payments to be sent on behalf of Investor K to Zia Trust.

Investor L

  51.  It was an example of and a further part of the scheme and artifice that:

23

a.  On or about January 22, 2008, **VAUGHAN** caused a letter to be mailed to Investor L's residence in Colorado.  In the letter, **VAUGHAN** solicited Investor L to invest either in the VCR promissory note program, VC, or a separate investment program called "Vaughan Equities III."

b.  On or about March 20, 2008, **VAUGHAN** caused Investor L to mail a $100,000.00 personal check to VCR via Federal Express to **VAUGHAN**'s office in Albuquerque.

c.  On or about March 20, 2008, **VAUGHAN** caused a promissory note documenting Investor L's $100,000.00 investment in VCR at 25% interest for one year to be mailed to Investor L's residence in Colorado.

d.  On or about March 31, 2009, **VAUGHAN** caused a promissory note documenting the roll over of Investor L's $100,000.00 investment at 25% interest for another year to be mailed to Investor L's residence in Colorado.

e.  From on or about April 10, 2008 to on or about December 14, 2009, **VAUGHAN** caused lulling interest payments to be mailed to Investor L's residence in Colorado.

f.  On or about January 6, 2010, **VAUGHAN** had a telephone conversation with Investor L during which he falsely stated that there were only 25-30 investors in the VCR promissory note program.

<u>Investor M</u>

52.  It was an example of and a further part of the scheme and artifice that:

a.  On or about July 29, 2008, **VAUGHAN** caused a solicitation letter, an Executive Summary, and a list of references for a VCR investment to be mailed to Investor M's residence in New Jersey.

b.  On or about August 20, 2008, **VAUGHAN** had a telephone conversation with

Investor M during which Investor M requested additional information.  **VAUGHAN** caused his personal financial statement, a photo of his house, and a photo of his Ferrari Testarossa to be mailed to Investor M's residence in New Jersey.

c.  On or about August 28, 2008, **VAUGHAN** caused Investor M to mail a personal check for $100,000.00 to invest in VCR.

d.  On or about August 28, 2008, **VAUGHAN** caused a promissory note documenting Investor M's $100,000.00 investment for three years at 25% interest and a copy of the Deed of Trust to be sent via facsimile to Investor M in New Jersey.

e.  From on or about September 9, 2008 to on or about December 14, 2009, **VAUGHAN** caused lulling payments to be mailed to Investor M in New Jersey.

<u>Investor N</u>

53.  It was an example of and a further part of the scheme and artifice that:

a.  On or about July 17, 2008, **VAUGHAN** caused Investor N to invest $80,000.00 in the VCR promissory note program.  Investor N delivered a cashier's check for $80,000.00 to **VAUGHAN** in **VAUGHAN's** office.  **VAUGHAN** gave Investor N a promissory note dated July 17, 2008 documenting the $80,000.00 investment for one year at 13% interest.

b.  On or about August 1, 2008, **VAUGHAN** caused Investor N to invest $19,399.10 in the VCR promissory note program from an IRA with Sunwest Trust.  **VAUGHAN** provided Investor N with a promissory note, dated August 1, 2008, documenting the $19,399.10 investment for three years at 13% interest.

c.  In or about August 2008, Investor N met with **VAUGHAN** in **VAUGHAN's** office.  When Investor N asked whether **VAUGHAN** could use Investor N's investment to pay interest to previous investors, **VAUGHAN** falsely answered "I never have and I never would."

d.  From on or about August 7, 2008 to on or about December 14, 2009,

**VAUGHAN** caused lulling interest payments to be mailed to Investor N's office in New Mexico.

<u>Investor O</u>

54.  It was an example of and a further part of the scheme and artifice that:

a.  On or about October 8, 2008, **VAUGHAN** met at an Albuquerque restaurant

with Investor O and other members of Investor O's family.  **VAUGHAN** caused Investor O, on

behalf of the members of the family's limited liability corporation ("LLC"), to invest

$1,000,000.00 in the VCR promissory note program.  Investor O provided **VAUGHAN** with a

check for $1,000,000.00 and **VAUGHAN** provided Investor O with a promissory note

documenting a $1,000,000.00 investment for 18 months at 20% interest.

b.  On or about January 12, 2009, **VAUGHAN** met in his office with Investor O.

**VAUGHAN** caused Investor O to hand-deliver one check for $1,000,000.00 from his bank

account and another for $1,000,000.00 from his family's LLC account to be invested in VC.

c.  On or about March 20, 2009, **VAUGHAN** held a meeting of VC investors

(including Investor O) in **VAUGHAN's** office.  At that meeting, **VAUGHAN** told the investors

he would not make any loans of VC money without consulting the investors.  He also stated that

a professional baseball player had invested "millions" in VC and that he could go to that baseball

player for more investment money at any time.

d.  On or about September 4, 2009, **VAUGHAN** called Investor O and asked

Investor O to invest another $1,000,000.00 in VC.  **VAUGHAN** told Investor O that, if he

invested an additional $1,000,000.00, **VAUGHAN** would give Investor O his interest in U.S.

Title, an interest that **VAUGHAN** stated was worth $1,100,000.00.  Investor O declined and

instead suggested that **VAUGHAN** transfer Investor O's $1,000,000.00 VCR investment to VC

as the promissory note was due to mature in March 2010.  **VAUGHAN** told Investor O that he did not think transferring the VCR investment was a good idea because VCR was such a good investment.  **VAUGHAN** asked Investor O if he had any additional money to invest.  Investor O provided **VAUGHAN** with a check for an additional $100,000.00 investment in VC, and **VAUGHAN** provided Investor O with an additional VC Confidential Private Placement Memorandum to document the additional $100,000.00 investment.

e.  From on or about October 11, 2008 to on or about November 11, 2009, **VAUGHAN** caused lulling interest payments to be mailed to Investor O's residence in New Mexico for the VCR investment.

f.  On or about May 8, 2009, May 11, 2009, September 4, 2009 and September 8, 2009, **VAUGHAN** caused lulling interest payments to be mailed to Investor O's residence in New Mexico for the VC investments.

g.  On or about February 9, 2010, **VAUGHAN** organized a meeting of investors at his office.  Investor O attended the meeting.  **VAUGHAN** told the investors that he was embarrassed that the economy had caused him to have "cash flow problems."  After the meeting, **VAUGHAN** falsely assured Investor O that VC was separate from VCR and was not affected by his financial difficulties.

<u>Investor P</u>

55.  It was an example of and a further part of the scheme and artifice that:

a.  In or about April 2009, **VAUGHAN** met with Investor P at Investor P's office where **VAUGHAN** explained the VCR promissory note program and asked Investor P to invest.

b.  On or about November 9, 2009, **VAUGHAN** caused Investor P to transfer $49,071.10 from his Zia Trust IRA to the VCR promissory note program.

     c. On or about November 9, 2009, **VAUGHAN** caused a promissory note documenting Investor P's $49,071.10 investment for three years at 12% interest to be mailed to Investor P's residence in New Mexico.

Submission of False Documents to Securities and Exchange Commission

     56. It was a further part of the scheme and artifice that **VAUGHAN** made false statements to and provided false documents to the Securities and Exchange Commission ("SEC") during its investigation of, among other things, the VCR promissory note program and the VC investment program. The false statements and false documents made by **VAUGHAN** to the SEC include, but are not limited to, those set forth in Counts 26-30 of this Indictment.

Counts 1 through 3<br>Wire Fraud

     Beginning at least as early as 2005 and continuing up to and including February 2010, in the District of New Mexico and elsewhere, the defendant, **DOUGLAS F. VAUGHAN**, together with others known and unknown to the grand jury, having knowingly and intentionally devised and engaged in a scheme and artifice to defraud individuals and entities, and to obtain money from individuals and entities by false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate commerce writings, signs, signals, and sounds for the purpose of executing said scheme and artifice to defraud. The scheme and artifice to defraud are described in paragraphs 1 through 56 of this Indictment, which are incorporated as if fully re-alleged herein.

Wire Transfers

     On or about the dates listed below, in the District of New Mexico and elsewhere, the defendant, **DOUGLAS F. VAUGHAN,** for the purpose of executing the scheme and artifice to defraud, knowingly and willfully caused the following wire transfers to be transmitted in

28

interstate commerce, by means of wire communication:

| Count | Originating Bank | Recipient Bank | Amount | Date of Transfer |
|-------|-----------------|----------------|--------|------------------|
| 1 | Investor A's Smith Barney Financial Mgm't Account ******0110 | VCR operating account with Charter Bank. Account ****7516 | $100,000.00 | 02/07/2008 |
| 2 | Investor A's Smith Barney Financial Mgm't Account ******0110 | Vaughan Capital LLC account with Compass Bank. Account ******4520 | $120,989.57 | 08/26/2009 |
| 3 | Investor B's Bank of America Account ********7003 | VCR operating account with Charter Bank. Account ****7516 | $300,000.00 | 10/12/2007 |

In violation of 18 U.S.C. §§ 1343 and 2.

<u>Counts 4 through 20</u>
<u>Mail Fraud</u>

Beginning at least as early as 2005 and continuing up to and including February 2010, in the District of New Mexico and elsewhere, the defendant, **DOUGLAS F. VAUGHAN**, together with others known and unknown to the grand jury, having knowingly and intentionally devised and engaged in a scheme and artifice to defraud individuals and entities, and to obtain money from individuals and entities by false and fraudulent pretenses, representations, and promises, caused documents, correspondence, and investment deposits and payments to be mailed, delivered and received either from the United States Postal Service or some other private or commercial interstate carrier for the purpose of executing said scheme and artifice to defraud. The scheme and artifice to defraud are described in paragraphs 1 through 56 of this Indictment, which are incorporated as if fully re-alleged herein.

<u>Mailings</u>

On or about the dates listed below, in the District of New Mexico and elsewhere, the

defendant, **DOUGLAS F. VAUGHAN**, for the purpose of executing the scheme and artifice to defraud, knowingly and willfully caused the following documents to be delivered by mail or some other private or commercial interstate carrier, as set forth below:

| Count | Investor | Date | Item Mailed |
|-------|----------|------|-------------|
| 4 | C | 01/06/2010 | Personal check #1003, dated 1/6/2010 for $125,000.00 mailed by Investor C to **VAUGHAN's** office |
| 5 | D | 04/09/2008 | VCR lulling payment, check #87025, dated 4/9/2008 for $3,000.00 mailed to Investor D's residence in Tennessee |
| 6 | E | 01/05/2010 | VC Private Placement Memorandum mailed to Investor E |
| 7 | F | 09/19/2006 | Personal check #9669, dated 09/19/2006 for $500,000.00 mailed by Investor F to **VAUGHAN's** office |
| 8 | G | 05/05/2009 | VC lulling payment, check #00144, dated 5/5/2009 for $6,856.47 mailed to Investor G's post office box in New Mexico |
| 9 | H | 11/23/2005 | Personal check #1015, dated 11/23/2005 for $225,000.00 mailed to **VAUGHAN's** office |
| 10 | H | 03/28/2008 | Personal check #1035, dated 03/28/2008 for $175,000.00 mailed to **VAUGHAN's** office |
| 11 | I | 06/10/2009 | VCR lulling payment, check #100441, dated 6/10/2009 for $6,049.32 mailed to A.R's residence in New Mexico |
| 12 | J | 11/11/2009 | VCR lulling payment, check #105980, dated 11/11/2009 for $2,465.75 mailed to Investor J's office in New Mexico |
| 13 | K | 11/20/2007 | Promissory note, dated 11/20/2007 mailed to Investor K's post office box in New Mexico |
| 14 | L | 03/20/2008 | Personal check #2347, dated 3/20/2008 for $100,000.00 mailed to **VAUGHAN's** office |
| 15 | M | 08/28/2008 | Personal check #1028, dated 8/28/2008 for $100,000.00 mailed to **VAUGHAN's** office |
| 16 | N | 12/10/2008 | VCR lulling payment, check #94806, dated 12/10/2008 for $883.29 mailed to Investor N's residence in New Mexico |

| 17 | O | 11/10/2008 | VCR lulling payment, check #94022, dated 11/10/2008 for $16,438.36 mailed to Investor O's residence in New Mexico |
| 18 | O | 05/05/2009 | VC lulling payment, check #00147, dated 5/5/2009 for $21,643.63 mailed to Investor O's residence in New Mexico |
| 19 | O | 08/26/2009 | VC lulling payment, check #00196, dated 8/26/2009 for $24,931.47 mailed to Investor O's residence in New Mexico |
| 20 | P | 11/09/2009 | Promissory note, dated November 9, 2009, mailed to Investor P's residence in New Mexico |

In violation of 18 U.S.C. §§ 1341 and 2.

<u>Counts 21 through 25</u>
<u>Money Laundering</u>

On or about the dates specified below, in the District of New Mexico and elsewhere, the

defendant, **DOUGLAS F. VAUGHAN**, did knowingly engage and attempt to engage in

monetary transactions by, through, or to a financial institution, in or affecting interstate or foreign

commerce, in criminally derived property of a value greater than $10,000, that is, transfers of

funds, such property having been derived from specified unlawful activity, namely, Wire and

Mail Fraud.

| Count | Date | Check # | Amount | Description |
|-------|------|---------|--------|-------------|
| 21 | 8/26/2009 | 197 | $100,000.00 | Transfer from VC to VCR Operating Account |
| 22 | 12/30/2009 | 245 | $50,000.00 | Transfer from VC to VCR Operating Account |
| 23 | 1/11/2010 | 248 | $50,000.00 | Transfer from VC to VCR Operating Account |
| 24 | 1/12/2010 | 249 | $25,000.00 | Transfer from VC to VCR Operating Account |
| 25 | 1/13/2010 | 251 | $50,000.00 | Transfer from VC to VCR Operating Account |

In violation of 18 U.S.C. §§ 1957 and 2.

Counts 26 through 30
False Writings and Documents

On or about the dates specified below, in the District of New Mexico and elsewhere, the

defendant, **DOUGLAS F. VAUGHAN**, did knowingly and willfully make and use false writings

and documents that contained materially false, fictitious, and fraudulent statements and

representations in a matter within the jurisdiction of the Securities and Exchange Commission,

an agency within the executive branch of the Government of the United States, when the

defendant, **DOUGLAS F. VAUGHAN**, in written submissions intended for and received by the

Securities and Exchange Commission, stated in sum and substance that:

| Count | Date | False Statement |
|-------|------|-----------------|
| 26 | 9/21/2009 | "[T]he Promissory Note Program has generated more than sufficient revenue from its real estate investments to service its loans for the last sixteen years and return a profit to [**VAUGHAN**]." |
| 27 | 10/7/2009 | "I have a net worth in excess of $12,500,000." |
| 28 | 10/19/2009 | "[T]he Vaughan Company and [**VAUGHAN**] guarantee repayment of the Notes. . . .these two items of collateral provide over four times debt and interest coverage for the notes." |
| 29 | 10/19/2009 | **VAUGHAN** submitted a Financial Statement that (a) grossly overstated the stock value of his interest in VCR and NAI The Vaughan Co. Commercial at $2,975,000; (b) omitted any mention, as a liability or otherwise, of the more than $5.1 million in "loans to shareholder" that he owed to VCR; and (c) omitted any mention, as a liability or otherwise, of the approximately $70 million in personal guarantees he had made to VCR noteholders. |
| 30 | 12/4/2009 | With respect to the Vaughan Capital investment program, **VAUGHAN** stated "There have been no investments in any unrelated ventures." |

Whereas, in truth and in fact, the defendant, **DOUGLAS F. VAUGHAN**, then well knew

that these writings and documents contained statements and representations that were false.

In violation of 18 U.S.C. § 1001(a)(3).

## Forfeiture Allegation

Paragraphs 1 through 56 of this Indictment are incorporated as part of this section of the indictment as if fully re-alleged herein for the purpose of alleging forfeiture to the United States.

Upon conviction of one or more of the offenses alleged in Counts 1 through 20 of this Indictment, the defendant, **DOUGLAS F. VAUGHAN**, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)).

Upon conviction of any offense alleged in Counts 21 through 25 of this Indictment, the defendant, **DOUGLAS F. VAUGHAN**, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or any property traceable to such property.

Property to be forfeited to the United States includes but is not limited to the following:

1.    Money Judgment:

A sum of money equal to at least $74,386,623.38 in United States currency, including any interest accruing to the date of the judgment, representing the amount of money derived from or involved in the offense(s).

2.    Real Property:

6644 Baby's Tear Place, Las Vegas, Nevada, which is more particularly described as follows:  Unit 6 Parcel 24 at Rhodes Ranch, Plat Book 124, page 84, lot 132, block 2.

3.    Substitute Assets:

If any of the above described forfeitable property, as a result of any act or omission of the

defendant:

    A.   cannot be located upon exercise of due diligence;

    B.   has been transferred or sold to, or deposited with, a third person;

    C.   has been placed beyond the jurisdiction of the Court;

    D.   has been substantially diminished in value; or

    E.   has been commingled with other property which cannot be subdivided without

         difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C.

§ 982(b), to seek forfeiture of any other property of defendant up to the value of the forfeitable

property described above.

A TRUE BILL:


                              /s/

                      FOREPERSON OF THE GRAND JURY

Assistant United States Attorney

02/23/11  10:08am